Welcome and good morning. This is the time set for a number of cases this morning, but only two will be proceeding to oral argument. The first two cases on our docket, Rios Avalos v. Merrick Garland, has been submitted on the briefs. As the case of Avalos Cardona v. Merrick Garland, that has also been submitted on the briefs. So the first case for oral argument this morning is the case of Roger Palmer v. Stephen Sisolak. The parties already may come forward. Good morning. May it please the Court. Ray DiGiuseppe on behalf of the plaintiffs. I'd like to reserve three minutes for rebuttal, if I may. I'm having a little trouble hearing. If you could speak up. Okay. Is that better? Thank you. May it please the Court. It's important to remember who these plaintiffs are and what this case is about. As the complaint states, clearly Roger Palmer, Chad Moxley, and all the similarly situated members of Firearms Policy Coalition, whom they represent, are not seeking to evade background checks or avoid law enforcement detection or commit crimes with ghost guns. They are responsible, law-abiding citizens who simply seek to retain the firearms that they built lawfully under the prior law and to be able to continue self-manufacturing those arms for lawful purposes. However, they were not given a chance to pass a background check or to have any of their arms or parts serialized for purposes of being able to continue doing so. Instead, under AB 286, they were required to give up those arms and cease any of that activity under threat of criminal sanction. These plaintiffs are a world apart. So I understand your argument going backward, but is it possible now to obtain kits to manufacture guns that are serialized? It's not possible to obtain a firearm for purposes of self-manufacturing unless it's finished for purposes of this statute. It has to be under federal law in order to be even subject to a serialization requirement so that you could then build with it a finished receiver or frame. So maybe I misunderstood this, but I thought federal law was now requiring the gun part kits to be serialized, so that now that is something that I would have thought existed under that. The federal law is sort of mandating that you have that, so I'm wondering if now it does. Well, the federal law was recently changed. The rules were updated to expand the definition of a firearm for these purposes, but that definition is a lot more narrow than what we have under AB 286. In order to be actually an arm that has to be serialized under federal law, it's got to meet a lot more specific criteria in order to be even considered that. And also, just out of the gate, federal law exempts that process for personal use. So if you're engaging a self-manufacturer for personal use, there's no application of those restrictions as to your activity. But to go to Judge Freeland's question, your clients could buy those kits with a serial number today? They could buy kits which have finished frames or receivers for purposes of assembling a firearm. With a serial number. With a serial number. But here we're talking about being able to self-manufacture those If the part satisfies the definition of a frame or receiver for purposes of federal law so that it's serialized and therefore part of a kit which is available for commercial sale, it's finished. It's not something that you can actually manufacture. But you can't shoot it, right? It's only a part? Maybe you could explain more. I don't think it's a full gun, right? It's a finished frame or receiver for purposes of federal law. And it would have to be assembled at that point in order to be used. But where we are with this case is it's not just assembly that is protected, but it's actually manufacturing of the parts themselves. Does that mean like starting with metal that you then boil down or something? I mean, what does that mean? What do they want to do that they can't do? It means being able to start and complete the manufacturing process from the beginning with the parts that are necessary to do so, not having to buy a pre-serialized arm that are to be a firearm under federal law. But can you describe the difference of what the kit is that your, I think your client started with a kit, not just raw metal, right? So if they started from a kit, what's the difference between the kit they used and the kit that's available now? The kits that would be available now would be completed frames or receivers for purposes of federal law. But what's the difference? If you could answer that question, just... Well, it's a little tricky because ATF's rules as to what is considered a finished firearm for these purposes, when I say firearm, it means frame or receiver that's finished, are very specific. It's a case-by-case determination as to whether something actually fits within that definition. And they use industry-specific standards, like whether the manufacturer considered it to be a component that was for purposes of building a gun, whether it was common, whether it's understood to be that under the standards of the industry. So counsel, with that, let's take your description here as fact. And I know you're doing your best to answer these questions. So with that as a fact, what in the text of the Second Amendment, the right of the people to keep and bear arms, what arms is it that are specifically part of the plain text of the Second Amendment that with that addendum that you've added today, that your clients are unable to bear or keep? Well, I think we have to start with the recognition that went back to Heller, that the Second Amendment extends prima facie on its face to all instruments that constitute bearable arms. That's an initial point. So there shouldn't be any question or dispute that the firearms which have been, the completed firearms which have been banned are within that definition. We're really probably more concerned with the parts and the precursor parts and the activity of manufacturing or assembling firearms and to the extent that that's covered. I think we have to look at the fact that the Ninth Circuit included has said multiple times that the Second Amendment protects ancillary rights necessary to keeping and bearing arms including the ability obviously to acquire arms. There's nothing in the text or the case law or the relevant history that would warrant reading the Second Amendment narrowly so as to exclude and limit acquisition to purchasing from a third party as opposed to building. Could a state, could Nevada for example, if it determined that a gun, a pistol say, from Manufacturer A was unreasonably dangerous to the user or consumer because it would explode many times when fired in the hands of the shooter, could they ban that gun consistent with the Second Amendment? Could they say, you can't sell or possess Model X from Manufacturer A because we find it to be a defective product? I think that we would have to look at it from the perspective of what Bruin requires. First of all, asking whether the arm itself is protected under the Second Amendment. It's been established already that the Second Amendment protects all arms that are in common use that are not considered dangerous and unusual, okay, that by itself. So as a category, the banning of an arm by itself, that would still be a problem under the textual aspect of it. As for the history though, you can maybe move to the historical laws that were analogs. So banning in your view any bearable arm that isn't like a cannon or something, that that is prohibited by the text of the Second Amendment even if there are a hundred sellers of a similar arm and the state is banning the sale or the possession of one because, say, it's a defective product or because, let's say, the seller hasn't appropriately registered in Nevada and they say, somebody who hasn't registered to sell guns in Nevada can't sell guns in Nevada and so this particular model isn't available. Would that also get you to step two in Bruin because it would violate step one? Well, what I'm saying, it's not my test. It's a test that's already been... But I'm asking you for your view of it. So if the state banned the sale of a particular gun because the manufacturer hadn't appropriately registered in Nevada, would we only be able to justify that under step two because it would violate step one? I think we'd have to look at whether the arm is in common use for lawful purposes and not otherwise dangerous and unusual. If that is how one could classify the weapon, then it could be subject to a ban. But that's not what we have here. We're not talking about arms that have been declared as such and we also are working with a situation coming off of 12b-6 where we have alleged throughout the complaint that these are arms in common use for lawful purposes and that has to be taken as true and there's no evidence to the contrary. But as to your general point, that's what I would say, Your Honor, would type of weapon, whether it is in common use for lawful purposes and if there's a historical analog that could be pointed to by the state for purposes of showing that kind of arm, which had a danger of exploding or whatnot, could be banned, then you might be able to have a ban that's valid. But it has to be looked at. At this point, you say it doesn't matter that statistically these guns are often used for criminal activity by criminals? We don't take that into account? I think that we have to look at it from the perspective of what Bruin dictates and that is, is the conduct protected by the text of the Second Amendment? And if so, can the state show that there's a historical analog which would justify restricting it in that way? So we have pointed out in the briefing that the justification put forth by the state is essentially a false narrative. But in reality, it doesn't even really matter so much what it is the justification is because that's not what the test is. The test is not about the state is pursuing X interest and therefore the law is okay. It's Bruin, look at the text. Is it covered? If so, there has to be a historical analog that justifies the restriction. Are you arguing that these components are themselves arms? They are necessary to the construction of the arms which are protected themselves. So as an ancillary right for purposes of being able to engage in the Second Amendment rights that are protected insofar as, as I said, with acquisition, there is a right to acquisition. There's not a reason or a basis to read it narrowly. We have to read the Second Amendment and interpret it as it was understood at the time of the founding. But now you're going beyond the text, I think. I mean, so like I understand your argument more as to Section 5 than I do as to the 3 and 4 because the components, I think you're saying, are not arms, I think, and the manufacturing is not bearing. So I'm not quite sure where you get the Sections 3 and 4 under the text. Because of the acquisition element of it. The text protects, as the Ninth Circuit said to Shira, it protects the ancillary right of acquisition. There's nothing that would justify reading the text narrowly so as to exclude and limit acquisition to simply buying from a third party a completed gun or a completed finished frame and receiver. And I mentioned the historical period. I know there's a little bit of a blurring there, but not really because Bruin makes clear that the meaning of the text has to be considered as it was at the time of the founding. That's just another point about at the time of the founding when the people made this balancing or did the balancing for purposes of the Second Amendment and what it meant. Clearly, their form of acquisition at that time was self-manufacture. That was a primary way in which people came to bear and keep arms. Has any other circuit held that the text of the Second Amendment evinces a right to self-manufacture? There is a case that I cited in the briefing. I think it was out of the Third Circuit, but I might be mistaken. I'd have to look it up again. There's one case that I cited in there where the court... Well, there's a District of Delaware case, but that's not a circuit case. Right. I don't think there's a circuit level case that has come to that conclusion. What do we do about the fact that Section 3 is enjoined? Well, when we think about the Pullman abstention situation that the court asked for us to look at, I think it's important to keep in mind that the purpose of that whole doctrine is to avoid a collision between federal law and a state court ruling. There's not a collision here because you've got a state court issue under a state law challenge for void for vagueness only. Even if the Nevada Supreme Court affirms the lower court, you still have the problem to solve under the Second Amendment. But if the law is gone, why would we have a problem to solve? It would be enjoined permanently as to Sections 3 and 3.5, but that wouldn't do anything as to 4 and 5. But for 3 and 3.5, wouldn't you agree that if the Nevada Supreme Court affirmed, there's nothing for us to decide as to those sections? Well, I wouldn't say that that's entirely true, Your Honor. That would moot the injunctive relief that we're seeking, but it wouldn't touch the declaratory relief that we're seeking, which is important because the Nevada legislature, in response to such an affirmance, could go back and do a curative amendment to purge the vagueness, but we still have the Second Amendment issue being unaffected. Is it possible that the Nevada Supreme Court, in deciding the case, could tell us what these sections mean? Is it possible that they could say, well, the reason this isn't void for vagueness is because maybe you could read it this way and it's unclear what it means, but to avoid that constitutional problem, we're going to construe it this way so everybody knows what it means. Isn't that a possibility? It's a possibility, but it doesn't answer the purely federal questions under the federal Constitution as to the Second Amendment. No, but if that's what they decided, wouldn't it make sense for us to know if they're going to do that before we decide what the Second Amendment if we decide if there's a Second Amendment violation because the meaning of those sections could change in the construction of them by the Nevada Supreme Court? I don't think so, Your Honor, because the vagueness challenge going to what does it mean to be an unfinished framer-receiver, the determination of that is not going to materially affect the Second Amendment question here, which is a question that transcends Sections 3 and 5 and goes to 4, I'm sorry, 3 and 3.5 and goes to 4 and 5. The other thing is that Pullman has to be applied on a section-by-section basis. So if this court were to apply it as to 3 and 3.5, what happens to 4 and 5? There's no basis for not, for stopping the litigation as to those. The litigation would continue presumably as to 4 and 5 while 3 and 3.5 stay in abeyance essentially and that doesn't make a lot of sense and it's not efficient, which is counter to the whole purpose, one of the main purposes of Pullman, because you'd have an inefficient situation. I mean, the grovelment of the complaint that we have here is similar, basically substantially the same as to all the sections of the statute. The other thing is that the case law in the Supreme Court and this circuit has made clear that even if Pullman is otherwise properly applicable, it shouldn't be applied if there's going to be an impermissible chilling of constitutional rights in doing so. One other question, counsel. I'm a bit unclear from your brief. If we were to agree with you as to the plain text of the Second Amendment, why shouldn't we give the state a chance to develop the historical record for Part 2 when the district court didn't have Bruin and applied the test that was in essence at the time the district court decided, but obviously had no opportunity to apply Bruin? Why shouldn't we give the state the opportunity that it has requested to develop the historical record if we disagree with the state as to Part 1 of the Bruin test? Yeah, I understand, Your Honor. Well, as we pointed out in the briefing, we don't think it's necessary. If you look at the way that Heller was decided and Catano in those cases, there wasn't anything but legislative facts and there were no expert witnesses or extensive discovery as to the historical issues. I think we pointed out in the briefing that the historical question is fully resolved in a number of different ways. But for purposes of a remand, if there were a remand in the case, you know, we would understand if the court felt as though it was more appropriate to allow the district court judge to decide what, if anything, to do as to discovery and put that question before her. And we can address the question with Judge Due as to what extent there should be further discovery on that question and not have it be an issue where necessarily you all have to resolve something that would normally just go down with a general remand order. Did you want to reserve any of your time? Yes, if I may. Thank you. Good morning. May it please the court. Keel Ireland on behalf of the state. I'd like to start where Judge Freeland actually started in my friend on the other side's argument about the availability of serialized kits. And these kits are for sale by Ghost Gun, what were previously Ghost Gun kit manufacturers, but now they're serialized. And that's actually required by federal law now. The definition of a firearm under federal law, which means it requires a background check and a serial number, it includes a weapons part kit that is designed to or may readily be completed, assembled, restored, or otherwise converted into a gun, let's say. And so that would apply to Ghost Gun kits. And I think that's important here because, as Judge Freeland again pointed out, the only allegation of the conduct that from kits. There's no allegation that they're starting in the manner of a blacksmith in the 17th century, a man in a shop on the frontier. What they want to do is assemble guns from kits. And that is perfectly legal under AB 286, as long as they start with a serialized receiver. And it actually was possible under previous federal law as well, but where the line was drawn under federal law was a little different. So while they try to advance this very broad claim about a right to self-manufacture, I don't think they actually have standing to bring that kind of claim because the conduct they want to pursue is very narrow. In the same way that an environmental group wouldn't have standing to challenge the destruction of an environment that it never intends to visit, you have to allege that you actually want to pursue this conduct in order to have standing to bring a constitutional claim. So what I think though they have, I mean there's the going forward problem. So they may not have standing for injunctive relief going forward potentially, but what about the guns they've made before? So they don't have any retrospective relief claims. So I don't think they would have standing or it's not in the complaint. So they can't challenge those. I think our argument would apply equally to if they did have a retrospective claim because under former federal law, there was a line between what required a serial number and what didn't. And what the industry generally considered it to be was 80%. So an 80% complete receiver, no serial number, no background check. 81% you do need a serial number. And so again, plaintiffs could have just purchased an 81% receiver let's say and completed the weapon from there and it would have been perfectly legal under AB 286. So their claim would have to be that the Second Amendment protects that 1% extra assembly or it protects just the ability to assemble something without a serial number, which I don't really take their complaint or their it's more the constitutional right to assemble in the first place. And again, that's not something prescribed. Heller held that the legality of other firearms did not affect whether handgun restrictions were constitutional. So why doesn't that principle apply to the serialized, un-serialized distinction presented here? Your Honor, I think there are two problems with that argument. The first is that Heller specifically said that handguns can't be banned just because long guns are available. And that was because handguns are the most common, the most useful weapons for the right protected by the Second Amendment, which is the right to keep and carry weapons in the case of confrontation. But whether a gun is serialized or not has no effect on its functioning. And so I don't think that the narrow claim about handguns means that there can be no restrictions on handguns whatsoever. The other problem, I think, with that argument is that plaintiffs here are saying that they have an ancillary right because manufacturing is necessary to exercise their Second Amendment rights. And so by definition, to look at whether something's necessary or not, we need to see whether there are alternatives. Because if there are lawful alternatives, then it's not necessary. And here there's no dispute that serialized firearms and serialized kits are available in Nevada and hundreds of thousands are sold each year. When you say there's no dispute with regard to the serialized kits under the new federal law that both you and your friend have talked about, is there anything in the record that we have with regard to the availability of those new kits and how this differs from what happened before federal law was changed? No, Your Honor, there is nothing in the record about that. The allegations about the availability or unavailability of firearms are very conclusory in the complaint. We did present below public records from the federal government about the number of serialized firearms sold in Nevada. And I think that the court, this court and the district court, can take judicial notice of that on a motion to dismiss. But the availability of serialized kits are not in the record at this time. But again, I think that is publicly known information that this court could take judicial notice of if it wanted to go in that direction. Can I ask you to turn back to the thing you were saying about the forward-looking relief and standing in retrospective? Because I guess I thought that their claim, like, we have these guns we made before and we want to keep them, would be a forward-looking issue of whether they can keep them in Nevada or not. Is that not, am I not thinking about that right? What did you mean by that part of your answer? So that, yes, that they want to keep them. Of course, it'd be illegal for them to still have them at this point because the grace period is over. But in that case, the federal regulations do allow them to take them to a gunsmith so that they could get them marked in compliance with the law. The only thing they're not allowed to have is unserialized firearms anymore. If we were to remand for the further development of a historical record supporting AB 286, what do you anticipate would be part of the record? Well, I think that, first, I think the most important factual development would go around whether these are dangerous and unusual weapons or weapons in common use. I think at this time, the allegations are actually not sufficient to sustain that part of the claim. But if it was amended and there were more factual support for that in the complaint, then I think that would be a factual dispute between the parties. And then we did briefly touch upon some of the history that supports AB 286 around registration and tracking of firearms in the community. And I think that would be developed. And we would also, of course, want expert testimony about both the laws that we believe support AB 286 and the previous history that plaintiffs cite in their brief about, as we mentioned in our brief, a lot of the history they cite seems to be referring to the commercial sale of arms. So it's different. But I think that's a place where expert testimony could be really useful about what were these laws actually talking about? What did the firearm industry look like back then? What did the right to keep and bear arms look like back then as far as serialization, that kind of thing? I think that those are all areas where the district court is the best position to weigh the evidence, to decide what kind of evidence is relevant and not relevant, and then issue a decision that could be brought back up to this court on appeal. But as we stated in our brief, I don't think it's necessary for this court to remand. I arms are lawful, just like a shall carry regime, which does burden law-abiding citizens. All citizens have to register, as Judge Bennett mentioned. Registration is a permissible regulation of firearms. So in a shall issue regime, everyone who wants to carry a firearm outside the home, which is a core component of the Second Amendment, has to go through a process with the government. And that's all that AB 286 really does. But, I mean, with regard to your friend's argument, you have the Second Amendment that talks about the right to keep and bear arms. There's no question that, in your view, that, for example, a pistol with a serial number on it is an arm, right? Yes. But your view is that a pistol without a serial number is not an arm, as that term is used in the Second Amendment? The way I would phrase it, Judge Bennett, is that carrying a weapon without a serial number is not protected conduct under the Second Amendment. But is that what Bruin tells us we have to do? Is that what Bruin says our analysis should be? Because this is not, like, would you view this as a weapon because it doesn't have a serial number different in kind than what was there at the founding? So we have to look at technological advances or anything? It doesn't seem to me that that necessarily works. It's similar to the weapons that were in existence. The only question is, does a serial number converted from an arm, as to Part I of Bruin, does a serial number or the lack of a serial number answer the question of whether it's an arm covered by the Second Amendment? What am I missing here? Well, I think there's a different analysis apart from the in common use at the time analysis and the plain text step. And that's whether the conduct is protected or whether it is merely, whether the challenge law is merely an attempt to ensure that only law-abiding responsible citizens carry arms. And that's why I think we have to go back to the shall carry regime that was explicitly approved by the Supreme Court, because they're- Thumb types, not a blanket. Not a, but as long as it uses background checks, for example, specifically what they mentioned, and Justice Kavanaugh and the Chief Justice concurred on that point to even highlight it further. And so that is a law that restricts people from carrying lawful arms. I mean, there's no question about that. If you don't have a concealed carry license, then you go to jail. And that's the core right of the Second Amendment. But because it is only a prophylactic measure that ensures that it's the people who carry arms are law-abiding responsible citizens, that's allowed. And that's not considered within the scope of the Second Amendment's plain text. So I think that's the separate analysis that this court should do in this case. And that's what makes AB 286 constitutional, even on this appeal, without the need to remand. So do we, let me ask you, do we get to the historical analog part of this if these are not arms in common lawful use by law-abiding citizens? I would say that you don't have to. But that would probably be a determination for the district court in the first instance. But as we see it, Bruin establishes two tests at the first step and then one for the second step. So at the plain text step, we have the in common use or dangerous and unusual weapons. I think that's the same thing. And then this other test that they mentioned about shall carry regimes, which is if it is a prophylactic measure only to ensure that law-abiding responsible citizens keep and bear arms. If the law fails that test, then we go on to the historical analysis. I think that's how we read Bruin. And were you just saying you think the district court has to decide the first two parts? So because it wasn't really briefed in this court or in the district court, I think the dangerous and unusual or in common use part, that is really a decision for the district court. But our position is that the other one that I'm talking about, the prophylactic rule, the shall carry regime analog, that one that this court can affirm on that basis. And I think that actually this court, if it wants to go down that path, is better positioned in the district court because that's a pure issue of law on a novel topic. And in this court's golden nugget decision, which we cited in the brief, it's that actually the court of appeals is better positioned for that kind of determination rather than the district court. Are all of these issues really legal questions? Like, I understand the history is factual, but to what extent does it count as law in terms of who is best positioned to figure it out? Well, I think that it's not just reading laws in the same way that this court of appeals does every day, of course, because there's so much context that's necessary about what did it mean to be a gunsmith back then. So, as I mentioned before, Plaintiff's Brief talks a lot about gunsmiths in the colonial period. And honestly, I'm not really sure whether that refers to someone making their own arms or whether they're making it for the community and selling it. It's not self-manufactured if you're selling it to other people. So, I think that those kind of nuanced decisions are very difficult to do on appeal. And it's much better for the district court to be able to drive the factual development in a way that will allow both that court and this court to eventually answer the legal questions. And can I ask you about the litigation in the Nevada Supreme Court and what we should do about Section 3 and 3.5? Yes, Your Honor. So, while we would appreciate a decision, we believe this is a very important public policy in Nevada. Looking at the factors, I think we have to concede that those two sections fall under Pullman abstention and this court should abstain from deciding on those two sections. For the sections that refer only to un-serialized firearms, we would ask that this court decide those issues, but this court does have discretion to stay those as well if it thinks it's more efficient or there's some reason to not decide this law piecemeal. And is there any way to predict how long the Nevada Supreme Court will take to decide that case? Of course, we think we're going to win, but no, I don't think... Not the prediction of the outcome, but prediction of the timing. I'm just not familiar with how long they usually take to decide things. It really depends on the case and whether they want to do a published decision or an unpublished decision. So, we argued that case, I believe, in March. So, it's been a couple months, but unfortunately, much like this court, I can't really predict what their timing is going to be. So, if there's no further questions, I'd just wrap up to say that the only conceivable advantages of unregistered, un-serialized, and untraceable firearms is that they're easier for prohibited persons to obtain and they make it easier to get away with criminal activity. And those are not Second Amendment protected values. Bruin confirmed that states are allowed to pass laws like AB-286 that make sure that only law-abiding responsible citizens keep and bear arms in the jurisdiction. And for that reason, we would ask this court to affirm. You want to talk, since you have extra time, about takings at all? I know your friend across the aisle did not talk about the takings part. Yeah. Yes, Your Honor. I mean, I think almost all, if not all, of their arguments were either forfeited below or forfeited in this court for not being supported by briefing. But I think I could simply say that they put forward two types of per se takings and a Penn Central taking and all of them fail, all of their allegations fail to sustain their claim. A complete deprivation of economic value or Lucas-style taking that only applies to real property, not personal property. And here there's not even an allegation that all economically beneficial use was taken because the only allegation is that they won't get fair market value. And of course, they could move these firearms out of the jurisdiction and then they would maintain their value there. The other per se taking that they assert is a physical taking or an appropriation, but the state did not appropriate any of their property. Again, they are free to move it out of the jurisdiction or sell it. And as far as a Penn Central taking, their allegations don't support the massive diminution in value that a Penn Central taking requires. Again, they only have the speculation that if they had tried to sell it, they probably wouldn't have gotten fair market value. And besides being speculative, that just can't sustain a Penn Central taking claim. Is that last one something that they could potentially fix through amendment? Because I don't think they have had a chance to amend their takings claim. Is that right? Yes, but Your Honor, they never asked to and I don't think it's appropriate now to give them another chance when the allegations were so vague that I don't know if they truthfully could fix it. Again, there's no allegation that they even tried to sell it, so I don't know how we could know that there was enough of a diminution in value. And lastly, it's just outside the pleadings, but it's a matter of common sense that they could move the firearms out of the jurisdiction and then they wouldn't lose their value, or at least enough of it for it to be a Penn Central taking. And I think that's an appropriate conclusion on a motion to dismiss. And who should be the properly named defendant at this point? So the current governor, I think we probably mentioned in our brief that the current governor and then one of the administrators who had been named have been replaced, and so I forget which federal rule it is, but they automatically substitute in the new public officials. Because these claims are brought only against state officials in their official capacity. Again, there's no retrospective claim, and those claims would be subject to qualified immunity anyway, but there's no retrospective claim, there's no claim against anyone in their individual capacity. So, sorry, can I just, you had a footnote in your brief about this, but I didn't think you actually had listed everyone who has been replaced from the whole list of defendants in this case. Like, oh, I'm sorry, I don't remember the details. I think the person who is now the governor used to be a named defendant in a different role, and so I don't know who's in that role now. I'm forgetting that role. Okay, so yes, the current governor was the sheriff of the Las Vegas Metro Police Department, and those local law enforcement, there are a couple other ones too, were dismissed from the case previously. Voluntarily, I believe my friend on the other side can speak more to that, but they are not part of this appeal, and so they don't need to be replaced, I believe. Oh, so that's why they weren't in the footnote. So is it only two defendants who are still in the appeal? I need to check my footnote, because there's the Polymer 80 case too, and so I don't want to get confused. Yeah, so there are four state defendants who are left. Like I said, the local law enforcement officials were dismissed voluntarily and are not part of this appeal, and then the four that are part of this appeal, they were Stephen Sisolak, Aaron Ford, George Togliatti, and Mindy McKay. Stephen Sisolak was not reelected, so we have George Lombardo in that role, or Joseph Lombardo, sorry, you should know the governor. And Aaron Ford was reelected, George Togliatti kept his role, and Mindy McKay was replaced, or she retired, so there's a new person in her role. And I think this footnote also discusses the people who were dismissed earlier, and again, they are not part of this appeal, and I don't represent them, so I can't speak for them. Thank you. Thank you. Thank you, I don't have much time, but just to go over a couple of things, bear in mind here that this is a two-dimensional law in the sense that it also bans completed firearms. We can't get away from that, and the response on this side from my friend was that, well, they can just go get them serialized now. Well, that's just not true. You can't have firearms serialized after the fact because serialization has to occur before the point at which it goes to the consumer. You're not going to find any availability in that regard. That's been discussed in our briefs, so that's just not true, and you can't avoid application of the Second Amendment as to that dimension indisputably, the dimension being the completed arms. Is that a fact dispute, though? It sounds like the other side is saying you could take this gun that you manufactured from a kit and get it serialized now. No, Your Honor, we've cited in the brief the federal regulations that control the manner in which serialization occurs, and those are clear that serialization would have to occur before the point of sale, not after the fact. So I don't think that's a factual question in my understanding. I know it's a complicated regulatory scheme, but that's my understanding of it. The other matter is as to the precursor parts themselves and referring to the federal law, well, the federal law has, as I mentioned, he mentioned it himself, actually, it has to be something that's readily convertible into a frame of receiver. The state law, AB 286, refers to and covers any blank casting machine body that's still completely solid or unformed or un-machined. The federal law expressly excludes unformed products, so basically, I see I'm out of time. Do I have? Do your clients, I mean, so the state argued that your clients don't have standing to talk about something like unformed because they're not blacksmiths. What is your response to that? They wanted to use kits, right? They want to be able to construct their own arms, that's right, and I think the allegations that are in the complaint are plenty sufficient to be able to establish standing for those purposes. I mean, they had had kits. But unformed isn't something they're trying to do, right? They need the parts that are necessary to do the these parts, including things that are completely solid and un-machined, unlike the federal law, which requires that there be a, the process be much further along and that the product be at a point where it's readily convertible into a frame or receiver. So that's what AB 286, it basically means that they've got to get serialization on raw materials, in a sense, which makes it impossible. But your clients aren't using raw materials, right? They're not trying to use metal and have a kiln, or I don't know what it's called, but they're not doing that, right? They're not saying they want to do that. Well, I think that they are. I think the complaint is clear in the general sense that they want to be able to and need to have access to all the parts that are banned under AB 286, which by the language of the statute require a serial number that you can't get. So to the extent that any of the parts that are banned in the absence of a serial number, they need to have for purposes of construction, whether it's part of a kit or outside of a kit, that's the problem. And can I ask you if you've ever asked for leave to amend your takings claim? I went back through and read Judge Due's order, and she has a section at the end of her order in the motion to dismiss where I believe she said something like, plaintiffs have requested leave to amend, but I'm going to deny that because it can't be cured. I'm pretty sure that we did argue that at one point in the briefing, at least the ability to be able to cure any problem to the extent that the court found one for purposes of sufficiency under 12B6. I'm not 100 percent certain, but looking back at her order, there is again at the end of it, she says that it would be futile to allow us to do that. So yeah, she says plaintiffs request for leave to amend the complaint is denied. But that doesn't mean you asked for leave to amend the takings claim specifically. The takings claim? Yeah. Yes, she is referring to that. Well, I would have to go back and check the briefing to see what we specifically requested. Maybe I should ask, if you could amend your takings claim, how would you amend it? Well, on the takings claim, I think that to the extent more detail may be useful or necessary in terms of the impacts, we could do that. We did allege and has to be taken as true that there isn't a viable sales market. That's got to be taken as true under the 12B6 standard. Do we need to plead more specifically as to the nature of the market? We made a lot of allegations about the unrealistic nature of a sales market for purposes of the takings claim. Taking that as true as a factual matter, I don't think that that's speculative enough. And it's not conclusory? I mean, you didn't say, you know, we tried to sell it in Alabama and no one bought it or anything specific. We allege that trying to do that would have been inherently risky in and of itself because of all the federal regulations that concern selling items beyond across state lines. And you're talking about a product that has been deemed illegal in another state and you're trying to sell it somewhere else. It's just inherently risky for anybody to get involved in that kind of activity. So we did allege that as a real concern, realistically, with being able to try to garner value from the product. And that's in your complaint that it's risky because it's illegal in one state? I don't remember that, but maybe I'm just forgetting. I believe it is in the complaint, Your Honor. I believe so. As part of the allegations in terms of the risk, we allege that others or others across state lines wouldn't be willing to engage in or participate in that kind of transaction because of the risks involved. Pretty sure we had that in there, too. But anyway, I don't want to keep burning up the clock. Thank you very much. I appreciate your time. The case of Roger Palmer v. Stephen Soselic, or the current governor, is now submitted.
judges: MURGUIA, FRIEDLAND, BENNETT